IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| ALBERT W. MCDANIELS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 108-110 |
| | ) | |
| CAROLINE LEE, Director of Nursing, | ) | |
| | ) | |
| Defendant. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

At the time of the events forming the basis for the above-captioned case brought pursuant to 42 U.S.C. § 1983, Plaintiff was an inmate incarcerated at the Richmond County Jail ("the Jail") in Augusta, Georgia. Now before the Court are the parties' cross motions for summary judgment. (Doc. nos. 34, 36, 41). Both parties filed oppositions in response, as well as reply briefs in support of their respective motions for summary judgment. (See doc. nos. 40, 44 -46, 50 - 57).[1] For the reasons that follow, the Court **REPORTS** and **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED**, that Plaintiff's motion for summary judgment be **DENIED**, that judgment be **ENTERED** in favor of Defendant, and that this civil action be **CLOSED**.

I.     **FACTS**

In the above-captioned case, Plaintiff alleged claims for deliberate indifference to a

---

[1]Some of the responses and replies to the motions for summary judgment were submitted and filed as motions (doc. nos. 46, 53, 54), and will be addressed *infra*.

serious medical need – his mental health as well as his HIV – against Defendant Lee. Plaintiff maintains that Defendant Lee was deliberately indifferent in treating Plaintiff's medical needs because thirty-seven (37) days passed from the time he was booked into the Jail before he was seen by a doctor, ten more days passed before he received any HIV-AIDS medication, he lost sixty-six (66) pounds, and his mental illness was aggravated because he was not receiving medication. (See generally doc. no. 1). Defendant Lee is the Health Services Administrator at Correctional Medical Services, Inc. ("CMS"). (Doc. no. 36, Lee Aff. ¶ 3). CMS is a private company under contract with the Jail to provide certain medical services. (Id. at 6). Defendant Lee worked at the Jail as an employee of CMS. (Id.). Plaintiff maintains Defendant Lee was responsible for insuring he received proper medical treatment.

Plaintiff was booked into the Jail on June 4, 2008. (Doc. no. 36, Lee Aff. ¶ 10 and Ex. A). Pursuant to the Correctional Medical Health Services Policy and Procedures Manual, upon intake inmates undergo a screening. (Id., Ex. S). The "screening is the responsibility of the healthcare staff, assisted by security at Richmond County Law Enforcement Center."[2] (Id.). On June 4th a sheriff's deputy completed the intake questionnaire with Plaintiff. (Id., Lee Aff. ¶ 11). The intake questionnaire specifically asked whether the inmate, in this case Plaintiff, "currently [has] any medical problems," whether Plaintiff "take[s] any medication," and "whether Plaintiff "take[s] any psychiatric medications." (Id., Ex. A). Plaintiff responded "no" to all questions asked. (Id.). Based on

---

[2]Security will then call medical if any problems are identified. (Doc. no. 36, Def.'s Br., p. 16 n.1 and Ex. S).

2

Plaintiff's responses to the questionnaire, he was transferred to the Charles B. Webster Detention Center. (Id., Lee Aff. ¶ 12).

While at the Charles B. Webster Detention Center, Plaintiff submitted various Health Service Request Forms ("Health Forms"). (Id., Lee Aff. ¶ 13 and Ex. B). In particular, Plaintiff submitted Health Forms, on June 11, 2008, June 12, 2008, June 16, 2008, and June 17, 2008. (Id., Ex. B ). In the Health Service Request Forms Plaintiff complained that due to his "illness," he needed, but was not receiving, a special high calorie high fiber diet."[3] (Id., Ex. B).

On June 16, 2008, pursuant to the Jail Policy and Procedures, Plaintiff was provided an Intake Mental Health Screening and Assessment, and for the first time, disclosed that he had mental health issues. (Id., Lee Aff. ¶ 14 and Ex. C). On that same day, Plaintiff declined mental health treatment and agreed to notify Correctional Medical Services ("CMS") should problems arise. (Id., Lee Aff. ¶ 14 and Ex. C). July 12, 2008, was the first time since his June 4th incarceration that Plaintiff complained about mental health issues. (Id., Ex. J). Plaintiff was immediately scheduled for a psychiatric consultation and met with a psychiatrist on July 15, 2008. (Id., Ex. K). Also on July 15th, Plaintiff signed a psychotropic medication

---

[3]"Nurse Boone" noted on a "Correctional Medical Services Inter Disciplinary Progress Notes" form that she saw Plaintiff on June 13, 2008 at sick call. (Doc. no. 42, Ex. L-2). She further noted that Plaintiff stated he was HIV positive, but there was no proof in charts to support Plaintiff's claim. As such "Nurse Boone" requested that Plaintiff sign an Authorization to Disclose Health Information to allow CMS to obtain information from the Medical College of Georgia, regarding his HIV diagnosis. (Id.). However, Plaintiff refused to sign the authorization because he did not want to be housed at the Jail. (Id.). Furthermore, the nurse noted that Plaintiff "refused to speak to anyone about his HIV status if it will result in being moved." (Id.). Without the authorization, Plaintiff's HIV status could not be determined/verified.

3

consent form to allow CMS to begin treating his condition. (Id., Ex. L).

Concerning Plaintiff's HIV claim, on June 17, 2008, Plaintiff signed an Authorization to Disclose Health Information to allow CMS to obtain information from the Medical College of Georgia, regarding his HIV diagnosis. (Id., Lee Aff. ¶ 15 and Ex. D). On June 18, 2008, Plaintiff received his fourteen-day from intake physical exam. (Id., Lee Aff. ¶ 16 and Ex. E). Pursuant to the Jail's Policy and Procedures Manual, as previously noted, a security officer performs the intake process and if a prisoner indicates a need for medical care, the prisoner is then examined by a nurse. (Id., Ex. S). However, where a prisoner – as Plaintiff – does not provide any need for medical care, the prisoner is examined pursuant to jail policies within fourteen days from his intake. (Id.). At the June 18th examination Plaintiff mentioned his HIV-condition,[4] and he also signed a release form regarding lab work. CMS sent his blood work to the laboratory that same day and the lab work was returned on June 26, 2008. (Id., Lee Aff. ¶ 16 and Ex. F).

The initial lab work was an HIV diagnostic examination only. (Id., Lee Aff. ¶ 17 and Ex. F). The custom and practice of CMS is to perform the diagnostic test first, and request the HIV-database only if the inmate is HIV positive. (Id., Lee Aff. ¶ 17). The initial lab work does not measure Plaintiff's CD4+ levels nor his viral load. (Id., Lee Aff. ¶ and Ex. F).

Plaintiff was transferred back to the Jail by June 20th, where he remained until February 9, 2009. (Id., Lee Aff. ¶ 18). Initially, Plaintiff was scheduled to see Dr. Rogers

---

[4]As previously noted, Nurse Boone recognized that on June 13th Plaintiff claimed that he had HIV; however, he refused to sign the authorization to verify his HIV status. (Doc. no. 42, Ex. L-2).

4

on June 27, 2008, but Dr. Rogers requested to reschedule the appointment because Plaintiff's full lab work, the HIV-database, had not been completed. (Id., Lee Aff. ¶ 19, Rogers Aff. ¶ 6 and Ex. G). Dr. Rogers requested to reschedule the appointment because in order to better determine the appropriate medial treatment protocol for Plaintiff's condition, he needed Plaintiff's HIV-database.

At the Jail, routine sick-call patients are seen once a week on Fridays. Thus, Dr. Rogers performs his examinations at the Jail on Fridays. The first Friday after the lab results were available was July 4, 2008. (Id., Lee Aff. ¶ 20 and Rogers Aff. ¶ 7). It is CMS's policy not to schedule routine sick call appointments on holidays. (Id., Lee Aff. ¶ 20). Therefore, Dr. Rogers's first appointment with Plaintiff was July 11, 2008. (Id., Lee Aff. ¶ 20 and Ex. I). On July 11, 2008, the lab report was complete and Dr. Rogers met with Plaintiff to discuss the results, as well as Plaintiff's current condition, treatment options, blood work, and prognosis. (Id., Rogers Aff. ¶ 7). Based on the lab results, Plaintiff's CD4+ T-cell count was 223, which is "dangerously low."[5] (Id., Rogers Aff. ¶ 7 and Exs. I, H). Based on the lab results, Plaintiff's viral load was 18,219.[6] (Id.).

During the July 11, 2008, consultation, Plaintiff informed Dr. Rogers that he had been diagnosed with HIV in 1993, but that he had not taken his medication for the previous four

---

[5]The CD4+ T-cell is a type of white blood cell that is vital to fighting infection. (Doc. no. 36, Rogers Aff. ¶ 7). According to the National Institute of Health, a CD4+ T-cell count less than 200 indicates that a patient has transitioned from HIV-positive status to AIDS. (Id.).

[6]The viral load indicates the amount of HIV in the blood. (Id.). According to the National Institute of Health ("NIH"), generally, patients with a high viral load progress to AIDS more quickly. (Doc. no. 36, Rogers Aff. ¶ 7 and Exs. I, H).

5

(4) to five (5) years. (Id., Rogers Aff. ¶ 8). Dr. Rogers explained to Plaintiff that prolonged interruption of compliance with taking anti-retroviral therapy can lead to an exacerbation of the condition and/or drug resistance. (Id.). At that consultation, Dr. Rogers prescribed Atripla, additional lab work, and a follow-up appointment in ninety days. (Id., Rogers Aff. ¶ 8 and Ex G). Plaintiff had his next consultation with Dr. Rogers on October 31, 2009. (Id., Rogers Aff. ¶ 9). At that consultation Plaintiff denied any signs or symptoms of AIDS and told Dr. Rogers he was "100% compliant" in taking his medication. (Id., Rogers Aff. ¶ 9 and Ex. M). Additionally, Dr. Rogers noted that Plaintiff had not experienced any excessive weight loss; Dr. Rogers explained that excessive weight loss is an issue of particular concern when treating HIV patients. (Id., Rogers Aff. ¶ 9). Plaintiff also did not have pneumonia or any acute symptoms of HIV. (Id.). Dr. Rogers ordered more lab tests and continued with his current HIV medication while awaiting test results. (Id.). Dr. Rogers also explained to Plaintiff that if his lab results did not improve, changes would have to be made to his treatment protocol. (Id.). Plaintiff indicated that he understood and agreed with the recommendations. (Id.).

The lab results were returned on November 6, 2008, and Plaintiff met with Dr. Rogers on November 7, 2008. (Id., Rogers Aff. ¶ 11 and Ex. N). Plaintiff's CD4+ levels had dropped to 144, and Dr. Rogers diagnosed Plaintiff with HIV/AIDS. (Id., Rogers Aff. ¶ 11 and Ex. O). Notably, Plaintiff again affirmed he had no acute symptoms and was "100% compliant" in taking his medication. Because of the lab results, Dr. Rogers modified Plaintiff's treatment and ordered a repeat of the blood tests as well as a 90-day follow-up consultation. (Id., Rogers Aff. ¶ 11 and Ex. O). The blood tests were returned on December

16, 2008, and Plaintiff's next consultation with Dr. Rogers was January 22, 2009. (Id., Rogers Aff. ¶ 13 and Exs. P, Q). Plaintiff's lab results demonstrated that his CD4+ T-Cell count rose from 144 to 170, and his viral load had dropped from 18,219 to 335. (Id., Rogers Aff. ¶ 13 and Exs. P, Q). Thus, Dr. Rogers deemed that Plaintiff's treatment protocol was effective, and his condition was still clinically and physically stable. (Id., Rogers Aff. ¶ 13 and Ex. Q). Further Plaintiff confirmed that he remained "100% compliant" in taking his medication; the lab results supported Plaintiff's statements. (Id., Rogers Aff. ¶ 13 and Ex. Q).

The January 22nd consult with Dr. Rogers was Plaintiff's last consult with him because Plaintiff was transferred to another facility. (Id., Rogers Aff. ¶ 14). Dr. Rogers states that Plaintiff never complained or indicated that he was having any problem receiving his prescribed medication. (Id. at 9). Additionally, concerning Plaintiff's weight, Dr. Rogers, determined Plaintiff had not experienced any excessive weight loss, and indeed, his medical records show that on June 13, 2008, Plaintiff weighed 169 pounds, on June 16, 2008 Plaintiff weighed 170 pounds, on October 12, 2008, Plaintiff weighed 168 pounds, and on December 15, 2008, Plaintiff weighed 170 pounds. (Id., Ex. B).

Dr. Rogers opined that to a reasonable degree of medical certainty, the fact that Plaintiff did not receive an HIV/AIDS medical consultation and begin his treatment protocol until 37 days after his initial intake at the jail did not cause or contribute to cause any injury to Mr. McDaniels. (Id., Rogers Aff. ¶ 18.). Furthermore, Dr. Rogers determined that Plaintiff has not been damaged, nor injured, beyond his condition at the time of intake at the Jail. (Id. at 16). Dr. Rogers maintained that Plaintiff arrived at the Jail HIV positive and

7

CMS treated him appropriately and the proper standard of care. (Id.). Finally, Dr. Rodgers opined to a reasonable degree of medical certainty, that when Plaintiff left the Jail, he was in substantially the same condition as when he arrived, but he had improved in that he was compliant with his routine medication and was responding well to treatment. (Id. at 17).

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Applicable substantive law identifies which facts are material in a given case.[7] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When seeking summary judgment, the movant must show, by reference to materials on file, that there are no genuine issues of material fact to be decided at a trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (*en banc*). On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element

---

[7]The Court is mindful that for purposes of summary judgment, only disputes about material facts are important. That is, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

8

of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial. Clark, 929 F.2d at 606-08 (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Merely stating that the non-moving party cannot meet its burden at trial is not sufficient. Id. at 608. Evidence presented by the movant is viewed in the light most favorable to the non-moving party. Adickes, 398 U.S. at 157.

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark, 929 F.2d at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981). Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255 (quoting Adickes, 398 U.S. at 158-59). A genuine issue of material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

### B. Merits of Plaintiff's Claims

Plaintiff alleged that Defendant Lee was deliberately indifferent in treating Plaintiff's medical needs because 37 days passed from the time he was booked into the Jail before he was seen by a doctor, ten more days passed before he received any HIV-AIDS medication, he lost sixty-six (66) pounds, and his mental illness was aggravated because he was not receiving medication. (See generally doc. no. 1). Defendant, on the other hand, states that

she is entitled to summary judgment because Plaintiff does not offer any evidence of a constitutional violation and/or any indifference to his medical need. (Doc. no. 36, memo. p. 1). Rather, Defendant asserts that Plaintiff "was the architect of his own alleged delay" when he refused to disclose his medical (physical and mental) needs upon his booking at the Jail. Additionally, Defendant asserts that she is entitled to qualified immunity. (Id.).

Bearing the standard for a motion for summary judgment in mind, Defendant's motion for summary judgment should be granted and Plaintiff's should be denied.[8] To survive Defendant's motion for summary judgment, Plaintiff must produce evidence from which a reasonable jury could conclude: (1) that Plaintiff had an objectively serious medical need, (2) that Defendant Lee acted with deliberate indifference to that need, and (3) that Plaintiff's injury was caused by the Defendant Lee's wrongful conduct. Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007) (citations omitted). Although Plaintiff's HIV-AIDS and mental health constitute a serious medical need, Plaintiff has not shown that Defendant Lee acted with deliberate indifference to his serious medical need.

---

[8] A claim that a pretrial detainee has been denied adequate medical care is properly addressable under the Due Process Clause of the Fourteenth Amendment. Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979). The Eleventh Circuit Court of Appeals has held that "in regard to providing pretrial detainees with basic necessities as food, living space, and medical care the minimum standard allowed by the Due Process Clause is the same as that allowed by the Eighth Amendment for convicted persons." Hamm v. Dekalb County, 774 F.2d 1567, 1574 (11th Cir. 1985). Because the Eleventh Circuit has held that the minimum standard for the provision of basic necessities, including medical care, is the same for convicted prisoners under the Eighth Amendment and for pretrial detainees under the Fourteenth Amendment, it is appropriate to examine Eighth and Fourteenth Amendment decisional law concerning Plaintiff's claim. See Lancaster v. Monroe County, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997) ("Because both Eighth Amendment cases and Fourteenth Amendment cases establish what constitutes 'deliberate indifference,' we will rely upon decisions in both types of cases.").

To show that Defendant Lee was deliberately indifferent to his needs, Plaintiff must offer some proof that Defendant: (1) was subjectively aware of a serious risk to Plaintiff's health, and (2) that Defendant Lee disregarded that risk by (3) following a course of action which constituted "more than mere negligence." Id. In addition, the prisoner plaintiff seeking to show that a delay in medical treatment amounted to deliberate indifference "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir.1994), *abrogated in part on other grounds by* Hope v. Pelzer, 536 U.S. 730, 739 n.9 (2002)); see also Farrow v. West, 320 F.3d 1235, 1244 n.12 (11th Cir. 2003) ("In Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L.Ed.2d 666 (2002), the Supreme Court criticized part of the qualified immunity analysis in Hill, but not Hill's analysis of what constitutes a serious medical need of prisoners."). To the extent that Plaintiff avers that Defendant Lee's treatment of his medical complaints was delayed or somehow deficient, his claims fail.

"[N]ot every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." West, 320 F.3d at 1243 (internal quotation and citation omitted). The Eighth Amendment does not mandate that the medical care provided to the prisoner "be perfect, the best obtainable, or even very good." Harris, 941 F.2d at 1510 (quoting Brown v. Beck, 481 F. Supp. 723, 726 (S.D. Ga. 1980) (Bowen, J.)). As the Supreme Court has explained:

> [A]n inadvertent failure to provide medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been

11

> negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). Thus, mere allegations of negligence or malpractice do not amount to deliberate indifference. Campbell v. Sikes, 169 F.3d 1353, 1363-72 (11th Cir. 1999) (explaining that medical malpractice cannot form the basis for Eighth Amendment liability); Harris, 941 F.2d at 1505.

Given these facts, nothing in the record supports the conclusion that Defendant Lee disregarded a serious risk to Plaintiff's health, or provided inadequate medical treatment, let alone that she followed a course of action that was "more than gross negligence." In fact, Defendant Lee was not aware of a serious medial risk until at the earliest, June 13, 2008.[9] Indeed, the record establishes that, when Plaintiff was booked into the Jail, he failed to notify anyone that he had any medical issues. Not only did Plaintiff fail to notify anyone at the Jail of his medical issues, but when he was specifically asked during intake whether he had any medical (physical or mental) problems and whether he took medication, he stated that he did not.[10] Then, even though on June 13, 2008, Plaintiff informed Nurse Boone that he had HIV,

---

[9]As the evidence presented must be viewed in the light most favorable to Plaintiff, the Court will presume that Defendant Lee was aware of the notation in the June 13th "Correctional Medical Services Inter Disciplinary Progress Notes," even though Plaintiff has made no such showing.

[10]Plaintiff's argument that Defendant Lee breached her duty because "she adopted an unofficial policy, procedure, and custom which results in delay of medical treatment and allows subordinates to act illegally" (doc. no. 36, p. 2), is without merit. As will be discussed *infra*, any delay in Plaintiff's medical treatment was a result of Plaintiff's actions.

12

he refused to sign the necessary authorization form that would confirm/verify his claim that he had HIV, a procedure necessary to provide him with the proper medical treatment. Concerning his mental health issues, Plaintiff notified CMS on June 16, that he had a mental health issue. But there again, he declined mental health treatment and instead, agreed to notify CMS should problems arise. (Doc. no. 36, Lee Aff. ¶ 14 and Ex. C). Thus, Defendant Lee was not aware of Plaintiff's serious medical need until at the earliest, June 13th pursuant to Nurse Boone's notes.

Furthermore, Plaintiff has not shown that Defendant Lee delayed in getting Plaintiff medical treatment. Concerning both Plaintiff's mental and HIV conditions, once he requested treatment and signed the appropriate consent forms, Plaintiff was promptly and appropriately treated. Thus, despite Plaintiff's contention, the record reflects that Defendant Lee did not delay in providing Plaintiff with medical treatment.

---

Secondly, concerning Plaintiff's statement that an unofficial policy resulted in the delay of his medications, the statement is conclusory and unsubstantiated. Plaintiff complains that because security performed his intake questionnaire, rather than medical, he did not truthfully answer the question whether he currently had medical problems. Plaintiff takes the position that security is unqualified to handle such information. However, the Policy Manual provides that "screening is the responsibility of the healthcare staff assisted by the security at Richmond County Law Enforcement Center." (Id., Ex. S). Furthermore, as described by Defendant Lee, inmates must be screened for chronic medical problems; when a prisoner identifies that he/or she has a medical problem, security will call medical. (Id., Def.'s Br., p. 16 n.1). Here, because Plaintiff did not identify any medical problem, medical was not called. (Id.).
    Plaintiff's arguments that security was not qualified to perform the screening and/or he did not believe security needed to know his medical problems, also miss the mark. The screening questionnaire only asked whether Plaintiff had a any current medical problems. Plaintiff only had to respond "yes" or "no." There was no need for him to identify his medical problem. Thus, had Plaintiff responded truthfully, that he had a current medical problem, security would have notified someone in medical, and Plaintiff would not have been required to inform security as to the nature of his medical problem.

Here, the record reflects that once Plaintiff notified CMS of his medical problems and signed the appropriate authorization, on June 16, 2008, Plaintiff was provided an Intake Mental Health Screening and Assessment, and for the first time, disclosed that he had mental health issues. (Id., Lee Aff. ¶ 14 and Ex. C). However, Plaintiff declined mental health treatment and agreed to notify CMS should problems arise. (Id., Lee Aff. ¶ 14 and Ex. C). July 12, 2008, was the first time, since his June 4th incarceration, that Plaintiff complained about mental health issues. (Id., Ex. J). Plaintiff was immediately scheduled for a psychiatric consultation and met with a psychiatrist on July 15, and on July 15th, Plaintiff signed a psychotropic medication consent form to allow CMS to begin treating his condition. (Id., Exs. K, L).

Concerning his HIV, only on June 17, 2008, did Plaintiff signed the Authorization to Disclose Health Information to allow CMS to obtain information regarding his HIV diagnosis. (Id., Lee Aff. ¶ 15 and Ex. D). That is, Plaintiff waited approximately two weeks after his incarceration before he gave his authorization for CMS to confirm/verify his HIV status. Thus, to the extent that Plaintiff complains that he was not seen by a doctor until 37 days after his booking, he has no one to blame but himself. On June 18, 2008, Plaintiff received his fourteen-day from intake physical exam. (Id. Lee Aff. ¶ 16 and Ex. E). At the June 18th examination Plaintiff again indicated he had and also signed a release form and CMS sent his lab work to the laboratory that same day; the lab work was returned on June 26, 2008. (Id., Lee Aff. ¶ 16 and Ex. F).

In the interim, Plaintiff was transferred back to the Jail by June 20th, where he remained until February 9, 2009. (Id., Lee Aff. ¶ 18). Initially, Plaintiff was scheduled to

14

see Dr. Rogers on June 27, 2008, but Dr. Rogers requested to reschedule the appointment because Plaintiff's full lab work – the HIV database – had not been performed. (Id. Lee Aff. ¶ 19, Rogers Aff. ¶ 6 and Ex. G). The lab results were available was July 4, 2008, but the first available appointment was July 11, 2008 as July 4th was a holiday. (Id., Lee Aff. ¶ 20 and Ex. I). On July 11, 2008, the lab result report was prepared and Dr. Rogers met with Plaintiff to discuss the results, Plaintiff's current condition, treatment options, blood work, and prognosis. (Id., Rogers Aff. ¶ 7). Plaintiff had his next consultation with Dr. Rogers on October 31, 2009. (Id., Rogers Aff. ¶ 9). Plaintiff next set of prescribed lab results were returned on November 6, 2008 and Plaintiff met with Dr. Rogers on November 7, 2008. (Id., Rogers Aff. ¶ 11 and Ex. N). Dr. Rogers modified Plaintiff's treatment and ordered a repeat of the blood tests as well as a 90-day follow-up consultation. (Id., Rogers Aff. ¶ 11 and Ex. O). The ordered blood tests results were returned on December 16, 2008, and Plaintiff's next consultation with Dr. Rogers was on January 22, 2009. (Id., Rogers Aff. ¶ 13 and Exs. P, Q). The January 22nd consult with Dr. Rogers was Plaintiff's last consult with him because Plaintiff was transferred to another facility. (Id., Rogers Aff. ¶ 14). Thus, while incarcerated at the Jail, Plaintiff was promptly and constantly treated by a physician.

Furthermore, to the extent Plaintiff claims there was any mismanagement of his medication, his argument misses the mark because he repeatedly informed Dr. Rogers that he was 100% compliant with his medical treatment. More, importantly, as noted by Dr. Rogers, Plaintiff's statement that he was 100% compliant with taking his medication was supported by the lab results. The lab results established he was responding to the treatment.

Plaintiff vehemently argues that Defendant Lee treated him with deliberate

15

indifference because the Medication Administration Reports reference that Plaintiff missed medications. (See generally doc. no. 56). First, Plaintiff himself told Dr. Rogers that he was 100% compliant with his medication, and he never raised any concern that he was having trouble receiving his medication. Second, and more importantly, to show a constitutional violation, Plaintiff must place verifying medical evidence in the record to establish the detrimental effect of [the] delay in medical treatment to succeed." Hill, 40 F.3d at 1188, *abrogated on other grounds by* Hope, 536 U.S. 730 (2002). Here, Plaintiff simply cannot do so, as his medical records show an improvement of his condition.

Moreover, Plaintiff's claim for deliberate indifference also fails because the record does not contain verifying medical evidence to establish a detrimental effect from any purported delay in medical treatment. Here, the record does not show, even taken in the light most favorable to Plaintiff, that a delay in treatment could have caused or exacerbated Plaintiff's medical condition. First, Dr. Rogers stated that based on Plaintiff's lab results, his initial viral load was 18,219 and his CD4+ T-cell count was 223.[11] (Id., Rogers Aff. ¶ 7). Thus, when Plaintiff arrived at the Jail, he was already dangerously close to AIDS status.[12] Second, and more importantly, Plaintiff acknowledged that he was diagnosed with HIV in 1993; however, for the 4 to 5 years preceding his incarceration at the Jail, Plaintiff ceased his HIV treatment. (Id., Rogers Aff. ¶ 8). Dr. Rogers further explained, "In the treatment of

---

[11]As previously noted, a CD4+ T-cell count less than 200 indicates that a patient has transitioned from HIV to AIDS.

[12]The viral load indicates the amount of HIV in the blood, and according to the NIH, generally, patients with a high viral load progress to AIDS more quickly. (Doc. no. 36, Rogers Aff. ¶ 7).

HIV/AIDS, such a prolonged interruption in the treatment protocol can lead to an exacerbation of the condition and/or drug resistance. (Id.). Although Plaintiff was diagnosed with HIV/AIDS on November 7, 2008, he does not in any way establish that the 37-day delay (that he caused) was the reason for this change in his status. Indeed, Dr. Rogers noted that Plaintiff had no acute symptoms, and did not have – contrary to Plaintiff's assertion – weight loss. In fact, Dr. Rogers opined, "[T]o a reasonable degree of medial certainty, the fact that [Plaintiff] did not receive an HIV/AIDS medical consultation and begin his treatment protocol until [] 37 days after his initial intake, did not cause or contribute to cause any injury to Plaintiff. (Id., Rogers Aff. ¶ 18). Notably, once Plaintiff started his treatment protocol, his viral load dropped from 18,219 to 335. Thus, his condition actually improved while at the Jail.

In sum, Plaintiff has not shown that Defendant Lee was aware that he had a serious medical need until two weeks after his intake. Additionally, Plaintiff did not show that Defendant Lee caused a delay in his medical treatment. Furthermore, even taking the 37-day delay (that Plaintiff caused) into consideration, he has not provided an facts sufficient to generate a dispute of material fact that this delay had a detrimental effect on him. Indeed, Plaintiff has not provided the Court with medical evidence to support his conclusions that Defendant Lee was deliberately indifferent to his serious medical needs or that he suffered any detrimental effects as a result of the timing of medical treatment he received while incarcerated at the Jail. Rather, the record demonstrates that, while incarcerated at the Jail, Plaintiff received prompt constant treatment once he notified CMS of his need for medical treatment and signed the appropriate consent forms. In fact, Plaintiff's medical condition had

improved in that he was compliant with his routine medication and was responding well to treatment. As such, Plaintiff has not shown a genuine issue of material fact, and Defendant Lee is entitled to summary judgment.[13]

## III. CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED**, that Plaintiff's motion for summary judgment be **DENIED**,[14] that judgment be **ENTERED** in favor of Defendant, and that this civil action be **CLOSED**.

SO REPORTED and RECOMMENDED this 27th day of October, 2009, at Augusta, Georgia.

*/s/ W. Leon Barfield*
W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

---

[13]The Court's conclusion in this regard pretermits consideration of Defendants' remaining arguments.

[14]Additionally, Plaintiff filed various other motions pertaining to the motions for summary judgment. (See doc. nos. 46, 53, 54). First, Plaintiff filed a "Motion Opposing defendant's Motion for Summary Judgment." (Doc. no. 46). In this motion, Plaintiff simply enumerated six facts which he believes are disputed and raise questions of fact. For the reasons stated above, Plaintiff's enumerated facts do not create a material question of fact. Next, Plaintiff submitted a motion to amend (doc. no. 53), and a motion for rebuttal (doc. no. 54). In these motions, Plaintiff seeks to supplement his previously filed motion for summary judgment and opposition to Defendant's motion for summary judgment. As the Court has considered all documents filed by Plaintiff, including the above stated, the Court **REPORTS** and **RECOMMENDS** that Plaintiff's motions be deemed **MOOT**.